# 24-1884-cv

## United States Court of Appeals

*for the*

## Second Circuit

NEUROLOGICAL SURGERY PRACTICE OF LONG ISLAND, PLLC,

*Plaintiff-Appellant,*

– v. –

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF LABOR, XAVIER BECERRA, DBA Xavier Becerra, in his official capacity as Secretary, United States Department of Health and Human Services, JANET LOUISE YELLEN, in her official capacity as Secretary, United States Department of the Treasury, JULIE A. SU, Acting Secretary of Labor, her official capacity as Acting Secretary, United States Department of Labor,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

ROY W. BREITENBACH
HARRIS BEACH PLLC
The Omni
333 Earle Ovington Boulevard,
  Suite 901
Uniondale, New York 11553
(516) 880-8484

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

Page

RULE 26.1 DISCLOSURE STATEMENT.....................................................1

JURISDICTIONAL STATEMENT .............................................................1

ISSUE PRESENTED FOR REVIEW .........................................................1

PRELIMINARY STATEMENT ..................................................................2

STATEMENT OF THE CASE.....................................................................4

    A.    Background on the No Suprises Act ........................................4

    B.    Impact of Department failures on Plaintiff ..........................10

    C.    Plaintiff commences this action against the Departments .................13

SUMMARY OF ARGUMENT ..................................................................21

STANDARD OF REVIEW .......................................................................23

ARGUMENT ............................................................................................23

    THE DISTRICT COURT ERRED IN DISMISSING THE AMENDED
    COMPLAINT ON GROUNDS OF MOOTNESS, STANDING, AND ON
    THE MERITS .........................................................................23

    A.    The District Court Erroneously Dismissed the Amended Complaint
        for Mootness.......................................................................23

    B.    The District Court Erroneously Dismissed Plaintiff's Cause of Action
        for Enforcement of Compliance with Statutory Deadlines.................27

    C.    The District Court Erred in Dismissing Plaintiff's Claim that
        Defendants Violated the Congressional Mandate that Defendants
        Ensure Certification of a Sufficient Number of IDR Entities.............34

i

D.    The District Court Erroneously Held that it Could Not Require Defendants to Provide Clarifying Guidance ......................................37

CONCLUSION ..................................................................................41

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................... 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................... 23

*Church of Scientology of Cal. v. United States*,
   506 U.S. 9 (1992) ............................................................ 24

*City of Erie v. Pap's A.M.*,
   529 U.S. 277 (2000) ......................................................... 24

*City of Mesquite v. Aladdin's Castle, Inc.*,
   455 U.S. 283 (1982) ......................................................... 26

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*,
   906 F.3d 41 (2d Cir. 2018) ............................................... 23

*Crouse Irving Hosp. v. City of Syracuse*,
   283 App. Div. 394, 128 NYS2d 433 (4th Dept. 1954) .................................... 33

*Forest Guardians v. Babbitt*,
   174 F.3d 1178 (10th Cir. 1999) ........................................ 34

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) .............................................. 24, 26, 27

*Haller v. U.S. Dep't of Health & Hum. Servs*,
   621 F.Supp.3d 343 (E.D.N.Y. 2022) ......................... 17, 29, 33

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................ 30, 31, 32

*Loper Bright Enters. v. Raimondo*,
   ___ U.S. ___, 144 S. Ct. 2244 (2024) ............................... 30

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................... 33

*Make the Road New York v. Pompeo*,
   475 F.Supp.3d 232 (S.D.N.Y. 2020) ................................. 41

*McGuire v. Hughes*,
207 N.Y. 516 (1913) ...................................................................... 33

*National Wildlife Federation v. U.S. E.P.A.*,
980 F.2d 765 (D.C. Cir. 1992) ..................................................... 32

*Neurological Surgery Practice of Long Island, PLLC v. U.S. Dep't of Health and Human Servs.*,
682 F.Supp.3d 249 (E.D.N.Y. 2023) ................................... *passim*

*New York v. U.S. Dep't of Homeland Sec.*,
408 F. Supp. 3d 334 (S.D.N.Y. 2019) ........................................... 41

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ................................................................ 36, 37

*Texas Medical Ass'n v. U.S. Dep't of Health and Human Servs.*,
654 F. Supp. 3d 575 (E.D. Tex. 2023) .......................................... 25

*Texas Medical Ass'n v. U.S. Dep't of Health and Human Svcs.*,
110 F. 4th 762 (5th Cir. 2024) ............................................ *passim*

*Texas Medical Ass'n v. U.S. Dep't of Health and Human Svcs.*,
587 F. Supp. 3d 528 (E.D. Tex. 2022) .................................. 3, 9, 26

*United States v. Texas*,
599 U.S. 670 (2023) ....................................................... 15, 27, 30

*United States v. Concentrated Phosphate Export Ass'n.*,
393 U.S. 199 (1968) ...................................................................... 24

**Statutes**

5 U.S.C. § 551 ................................................................................. 40

5 U.S.C. § 701 ................................................................................. 31

5 U.S.C. § 702 .......................................................................... 30, 40

5 U.S.C. § 704 ................................................................................. 30

5 U.S.C. § 706 .......................................................................... 36, 41

5 U.S.C. §§ 701-06 .......................................................................... 1

28 U.S.C. § 1291 .............................................................................. 1

28 U.S.C. § 1331 .............................................................................. 1

iv

42 U.S.C. § 300gg-111 ............................................................... *passim*

NY Fin Serv L. §§ 601-08, L2014, ch 60, Part H § 26 .................................... 6, 38

## Other

Fed. R. App. P. 32 ..................................................................... 43

Rule 12(b)(6) .......................................................................... 23

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellant Neurological Surgery Practice of Long Island, PLLC states that it has no parent company, and no publicly held corporation owns 10% or more of their stock.

## JURISDICTIONAL STATEMENT

The United States District Court, Eastern District of New York, had subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06.

This Court has jurisdiction under 28 U.S.C. § 1291 because the appeal is from the final Memorandum and Order of the District Court (Cogan, J), entered on April 1, 2024 (SPA-19-21),[1] and the final Judgment of the District Court (Cogan, J.), dated and entered April 3, 2024 (SPA-22) which disposed of all claims. The appeal is timely as Plaintiff-Appellant's Notice of Appeal was filed in the District Court on July 10, 2024 (A-544).

## ISSUE PRESENTED FOR REVIEW

The appeal from the district court's judgment raises the following issue: Should this Court vacate the District Court's Memorandum and Decision granting Defendants' motion to dismiss and remand for determination of its motion for a

---

[1] As used herein, SPA- refers to Special Appendix, A- refers to the Joint Appendix, and CA- refers to the Confidential Appendix. The Confidential Appendix, containing the complete September 26, 2023 declaration of Michael H. Brisman, M.D., is filed under seal pursuant to the District Court's 9-26-23 Order.

1

preliminary injunction on the basis that Plaintiff has standing, its causes of action are not mooted, and Plaintiff has sufficiently stated claims upon which relief can be granted? *Plaintiff suggests that this question should be answered in the affirmative.*

## PRELIMINARY STATEMENT

Plaintiff-Appellant, Neurological Surgery Practice of Long Island, PLLC ("Plaintiff"), is a private medical practice subject to the "No Surprises Act" ("NSA"), which was adopted in 2020 to protect patients from unanticipated expenses as a consequence of receiving medical treatment from an out-of-network health care provider. The NSA was intended to shiel consumers from experiencing these "surprise" medical bills by prohibiting health care providers from billing patients directly while giving providers the right to seek payment from the patients' group health plans via a negotiation and independent dispute resolution ("IDR") arbitration process implemented and overseen by Defendants. Almost immediately after it went into effect, Defendants' flawed implementation of the NSA became glaringly apparent. The Department of Health and Human Services received, in the first few months of implementation, more claims than it had projected for an entire *year*, and the NSA became the subject of multiple lawsuits.

In February 2022, a federal court held that the NSA's arbitration process violated the APA because rules promulgated by Defendants conflicted with the Act and unfairly tipped the scales in insurers' favor. *Texas Medical Ass'n v. U.S. Dep't*

*of Health and Human Svcs.*, 587 F. Supp. 3d 528 (E.D. Tex. 2022). Defendants released updated final rules for the NSA in response to this ruling (effective October 25, 2022), but Defendants continued to face allegations and lawsuits claiming that the independent dispute resolution ("IDR") process was plagued by preferential treatment favoring health insurers. *See e.g. Texas Medical Ass'n v. U.S. Dep't of Health and Human Svcs.*, 110 F. 4th 762 (5th Cir. 2024), *aff'g* 654 F. Supp. 3d 575 (E.D. Tex. 2023). Providers challenging the rules had been placed in a no-win situation: they were likely to receive deflated reimbursement rates regardless of whether they went in-network or risked the arbitration process.

The enormous failure of the roll out led to a hearing in September 2023, in the House of Representatives Ways and Means Committee, on the flawed implementation of the NSA.[2] The hearing resulted in a March 2024 letter to Defendants—signed by 39 members of Congress—outlining the failed implementation and highlighting, among other concerns, the remaining unresolved problems with compliance and enforcement of statutorily required payment timelines.[3]

---

[2] Hearing on Reduced Care for Patients: Fallout From Flawed Implementation of Surprise Medical Billing Protections, https://waysandmeans.house.gov/event/hearing-on-reduced-care-for-patients-fallout-from-flawed-implementation-of-surprise-medical-billing-protections/ (accessed November 13, 2024).

[3] *See* March 18, 2024 Letter from Congress of the United States, https://kslawemail.com/email_handler.aspx?sid=0f8ed525-7e8a-4ee3-ae8f-8ac0cb493497&redirect=https%3a%2f%2fwenstrup.house.gov%2fuploadedfiles%2fno_surprises_act_implementation_3.18.23.pdf&checksum=E4C8AC61 (last accessed November 13, 2024).

In this action, Plaintiff seeks an order directing Defendants-Appellees United States Department of Health and Human Services, Department of the Treasury, Department of Labor, and high-level officials of those agencies ("Defendants" or "HHS") to comply with their shirked statutory obligations to ensure, among other things, that there are sufficient certified IDR entities, enforce statutory timelines for reimbursement, and ameliorate the inaccurate guidance they issued concerning claim eligibility.

Plaintiff appeals from the April 3, 2024 Judgment of the Eastern District of New York (Cogan, J.), denying Plaintiff's motion for a preliminary injunction and granting the motions of Defendants to dismiss the complaint on the ground of mootness. Plaintiff's appeal seeks to vacate the dismissal because, as the letter from members of Congress demonstrates, the major issues in the implementation and enforcement of the NSA arising from Defendants failure to comply with statutory directives persist and continue to harm providers, like Plaintiff, who have been forced to turn to a broken IDR process to be reimbursed for the provision of life-saving medical care.

## STATEMENT OF THE CASE

### A.    <u>Background on the No Suprises Act</u>

This appeal involves the implementation of the No Surprises Act ("NSA"), Public Law No. 116-260, enacted by Congress in December 2020. The legislation

4

was intended to address the problem of "surprise billing" – where a patient that has group health insurance incurs unanticipated expenses as a consequence of receiving medical treatment from an out-of-network health care provider, an entity that does not have a payment contract with the patient's health insurance carrier. Absent legislation addressing this issue, out-of-network providers might receive a discounted portion of the fee owed from the patient's insurer and bill the remainder to the patient, a practice known as "balance billing." "The Act was spawned by complaints that patients . . . were susceptible to receiving 'surprise' bills from providers in circumstances, like emergency room visits or anesthesia administration, where they had no realistic choice of lower-cost in-network providers." *Texas Med. Ass'n v. United States Dep't of Health and Hum. Servs.,* 110 F.4th 762, 768 (5th Cir. 2024).

The NSA was intended to protect consumers from experiencing these "surprise" medical bills by prohibiting balance billing and creating a payment resolution process between the patients' group health plans and out-of-network providers. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. BB, tit. 1, 134 Stat. 1182, 2758-2890 (2020). With respect to bills covered by the NSA, the legislation precludes medical providers from billing or collecting payment from patients, eliminating common law remedies such as recovery in quantum meruit.

5

Plaintiff is one of the largest private neurosurgery practices in New York. (A-59). Although large for a private practice, Plaintiff is small relative to non-specialized practices and, as a result, does not have the negotiating power to bargain acceptable rates with health plan networks. (A-59). Accordingly, independent specialty groups, like Plaintiff, often do not join health networks, given the historic impossibility of negotiating adequate rates. (A-59). Thus, Plaintiff and its neurosurgeons and clinicians regularly provide lifesaving and medically necessary services on an out-of-network basis to enrollees of all major health plans. (A-59). Although New York has legislation addressing surprise bills (L 2014, ch 60, Part H, § 26), Plaintiff's provision of these services has been governed, in most cases, by the federal NSA since it went into effect in January 2022. 42 U.S.C. § 300gg-111, *et seq.* (A-59). Because health plans historically pay rates well below out-of-network providers' costs for services rendered, and providers like Plaintiff are prohibited by the NSA from billing patients directly, the economic survival of these providers is heavily dependent on functioning negotiation and arbitration processes established by the NSA. (A-60).

Under the NSA, "out-of-network [providers]," like Plaintiff, "are required to turn to the patient's insurer for payment of unreimbursed amounts . . . and insurers are obliged to pay them based on the prescribed 'out-of-network rate.'" *Id.* quoting 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II). As conceived by Congress, the out-of-

6

network rate—the amount required to be paid to the out-of-network provider—was to be determined by a quick and efficient process whereby (1) the health plan pays or denies payment to the provider within 30 days of receiving a bill from them, (2) a dissatisfied provider may elect to enter a 30-day negotiation period, and (3) if that fails, either party may initiate arbitration referred to as an independent arbitrator dispute resolution ("IDR") process within four days of the end of the negotiation period. *See id.* §§ 300gg-111(a)(1)(C)(iv), 300gg-111(c)(1)(A)-(B), 300gg-111(b)(1)(C).

The IDR process is "baseball style," meaning that each party submits a proposal as to the proper reimbursement amount and, instead of splitting the difference or independently calculating the amount it deems most appropriate, the arbitrator must choose one of the two offers as the out-of-network rate. *See id.* §§ 300gg-111(c)(5)(B)-(C). The intent is to provide an incentive for each party to make a reasonable offer. *See Texas Med. Ass'n*, 110 F.4th at 768; *see also* 42 U.S.C. § 300gg-111(c)(5)(A). The arbitrators are independent entities certified by Defendants to perform this role. The certified IDR entities are required, pursuant to the NSA, to render a decision within 30 days that is binding on the parties and not subject to judicial review. *Id.* § 300gg-111(c)(5)(A) and (E). Any additional reimbursement ordered by the arbitrator to the provider must be paid by the health

7

care plan directly to the provider within 30 days of the decision. *Id.* § 300gg-111(c)(6).

Unfortunately, Defendants—who are charged with interpreting and administering the NSA—have failed to implement a functioning process, allowing health plans to shirk their obligations with impunity at every step of the out-of-network rate determination process. Defendants have permitted health plans to avoid compliance with the 30-day time limit to provide payment or denial of payment with impunity. (A-61-62). When health plans do comply (or make a payment after the statutory period) it is at far lower reimbursement rates than they were offering before the NSA went into effect. (A-62). Out-of-network providers like Plaintiff are then forced into the IDR process. (A-64). Despite the outlined process, Defendants are not processing IDR claims in the required timeframe, are routinely allowing IDR-eligible claims to be rejected erroneously as ineligible and are taking no action to require health plans to pay claims they lose at IDR. (A-64-70).

To begin, although the legislation directed that Defendants establish the IDR process within a year of the December 27, 2020 effective date of the statute (*see* 42 U.S.C. § 300gg-111(c)(2)(A), Defendants failed to meet that deadline. The portal used to initiate the IDR process was not established until April 2022. (A-131). Moreover, not long after it became operational, Defendants were forced to close the

8

portal due to the overwhelming number of problems with the roll out and the invalidation of regulations Defendants adopted that, in contravention of the statute, attempted to restrict the arbitrator's discretion to determine the appropriate out-of-network rate. *See Texas Medical Ass'n v. U.S. Dep't of Health and Human Svcs.*, 110 F. 4th 762 (5th Cir. 2024), *aff'g* 654 F. Supp. 3d 575 (E.D. Tex. 2023); *Texas Medical Ass'n v. U.S. Dep't of Health and Human Svcs.*, 587 F. Supp. 3d 528 (E.D. Tex. 2022). Defendants attempted to open the portal incrementally on a limited basis throughout the fall of 2023, but did not ultimately reopen until December 2023. (A-386, 512). Even after the process was back up and running, Defendants have not meaningfully addressed the consequences of their gross underestimation of the number of disputes that would be submitted to IDR and failure to certify even a fraction of the number of IDR entities needed under their own (flawed) projections.[4] At the time that the amended complaint was filed, Defendants admitted that they had certified only 1/4th of the IDR entities that they determined would be needed to timely and efficiently process the amount of IDR disputes submitted. (A-217). As of March 2023, more than 91% of the 2022 IDR claims remained unadjudicated,

---

[4] *See* March 18, 2024 Letter from Congress of the United States, https://kslawemail.com/email_handler.aspx?sid=0f8ed525-7e8a-4ee3-ae8f-8ac0cb493497&redirect=https%3a%2f%2fwenstrup.house.gov%2fuploadedfiles%2fno_surprises_act_implementation_3.18.23.pdf&checksum=E4C8AC61 (last accessed November 13, 2024).

with over 95% of open IDR claims more than five months old—this despite the NSA mandate that the IDR process must be completed within 30 days. (A-247).

Given the delay of months or years in the IDR process, health plans have no incentive to provide anything but de minimis reimbursement up front. Indeed, they have every incentive to refuse to engage in meaningful negotiations, forcing virtually every claim into the delayed IDR system.

**B.**   <u>Impact of Department failures on Plaintiff</u>

As an out-of-network provider, Plaintiff is directly affected by Defendants' failure to properly implement and administer the No Surprises Act and its IDR process. The NSA states that Defendants "shall ensure that a sufficient number of [IDR] entities are certified . . . to ensure the timely and efficient provision of [IDR] determinations." 42 U.S.C. § 300gg-111(c)(4)(E). Defendants determined that they would need one certified IDR entity for every 440 IDR proceedings. (A-178). Yet, at the time of the amended complaint, Defendants estimated that it had certified only one IDR entity for every 25,756 proceedings. (A-178). Based on their own metrics, Defendants have clearly failed to comply with the IDR certification mandate.

As of March 15, 2023, Plaintiff had submitted 1,050 claims to NSA IDR but only 204 had been decided. (A-217). That means 81% of the submitted disputes were still unresolved. (A-217). This has resulted in serious economic consequences for Plaintiff and other similarly situated providers, who are expected to continue to

10

provide medically necessary and lifesaving services without timely reimbursement. It is not economically feasible for Plaintiff—or other small, specialized practices like Plaintiff—to continue to provide treatment to patients, with all the costs that entails, while not receiving adequate or timely reimbursement for past services rendered. (A-70-72). Defendants' failures have placed Plaintiff in danger of financial collapse. (A-70-72).

In addition to procedural failures, Defendants have made catastrophic substantive failures in their implementation of the NSA by systematically permitting eligible claims to be rejected as not subject to the NSA. Under the NSA, the federal IDR process does not apply when a reimbursement claim falls within the ambit of a "specified state law," i.e., a state surprise bill law that meets certain criteria and provides an alternative IDR process. *See* 42 U.S.C. § 300gg-111(a)(3)(I). The NSA was not intended to replace but, rather, was intended to complement existing state dispute resolution processes. Indeed, in many respects, the NSA was patterned after New York's surprise bill law, the New York Surprise Bill and Emergency Medical Services Law (enacted in 2014), which has a very similar dispute resolution process overseen by the New York Department of Financial Services. However, there are instances when a claim falls outside the scope of the New York law and must be adjudicated under the federal NSA. Certain procedures performed by an out-of-network provider—like elective procedures where the patient was aware that the

11

provider would be out-of-network—have been deemed not to fall within the definition of surprise bill under the New York law and are thus not eligible for New York IDR, meaning—given the prohibition on balance billing—that they must be processed under the federal IDR system. (A-179).

When these claims have been submitted to the federal IDR process, however, health plans have taken the position that they are not eligible for federal IDR because state law applies. (A-179-180). This is based on direct guidance provided by Defendants through their website that the New York Surprise Bill Law is "a specified state law" for all "non-emergency services provided by an out-of-network provider at an in-network facility or surgical center." (A-277-295). Defendants then refuse to process claims—like the elective procedures where the patient was aware that the provider would be out-of-network—through federal IDR, leaving providers without any means of recovery because such claims are not eligible for New York IDR. Defendants flawed guidance has caused further delays and, in many instances, left Plaintiff and other similarly-situated providers with no avenue to pursue appropriate reimbursements. Months into this litigation, after Plaintiff filed an amended complaint, Defendants silently removed the problematic guidance from their website (A-523-524), but it was too little too late as Defendants failed to issue clarifying guidance or take other action to correct this major eligibility issue and IDR entities continue to reject eligible claims on this basis.

12

**C.**   **Plaintiff commences this action against the Departments**

As a result of Defendants' deficient implementation of the NSA, Plaintiff commenced this action on April 20, 2023, to compel Defendants to comply with their statutory obligations[5] and to enforce statutory deadlines and requirements.[6] Plaintiff asserted these claims under the APA and the All-Writs Act, contending that Defendants deprived Plaintiff of its constitutional right to procedural due process and that their actions constituted an unconstitutional taking without just compensation.[7] (A-10-57).

Plaintiff moved shortly thereafter for a preliminary injunction to force Defendants' compliance with the timelines and requirements set forth in the NSA. (A-92-113).   Plaintiff explained that the Practice would be irreparably harmed without an injunction because it relies on fair and timely reimbursement to continue to provide high quality, medically-necessary care to patients, and Defendants'

---

[5] Including failure to adopt procedures to monitor compliance by third parties with their statutory obligations; failure to require health plans to state on explanation of benefit forms an understanding of whether the cases is IDR eligible and venue; failure to require health plans to engage in meaningful open negotiations; failure to follow the tight time frames established in the NSA for the IDR process; failure to establish streamlined processes for determining threshold eligibility issues and eliminate road blocks to the IDR processing system; failing to allow reasonable batching of similarly situated IDR claims; failing to follow NSA provisions that require reimbursement for certain procedures to be accepted and decided through the federal IDR process

[6] Including health plans' requirement to make the payment or denial of payment within 30 calendar days of transmission of the bill, timely payment of additional reimbursement due to providers, engagement in meaningful negotiations.

[7] Alleging that, because the NSA removes providers only other means of seeking reimbursement—billing the patient—the significant delays in repayment amount to a taking.

13

failures are directly impacting the Practice's ability to function, driving it and other specialty practices out of the market. (A-98, 100-104). It contended that it was likely to succeed on the merits due to Defendants violations of the APA, which states that a court may compel agency action where it has been unlawfully withheld or unreasonably delayed, as well as the Takings Clause of the Fifth Amendment. (A-105-112). Last, Plaintiff argued that the balance of the equities tipped decidedly in its favor, where Plaintiff faced economic ruin and proper implementation and enforcement of the NSA would serve patients and practitioners alike. (A-112-113).

In May 2023, Defendants moved to dismiss the complaint and opposed Plaintiff's motion for a preliminary injunction. (A-114, 123-155). Defendants argued that the court lacked subject matter jurisdiction over plaintiff's claims, and that the complaint failed to state a claim upon which relief could be granted. (A-141-151). Defendants further contended that the application for a preliminary injunction would be moot if the court granted the motion to dismiss the complaint. (A-152).

On July 17, 2023, the District Court for the Eastern District of New York (Cogan, J.) granted the motion to dismiss the complaint partially on standing grounds and for failure to state a claim upon which relief could be granted and denied Plaintiff's motion for a preliminary injunction as moot. *Neurological Surgery Practice of Long Island, PLLC v. U.S. Dep't of Health and Human Servs.*, 682 F.Supp.3d 249 (E.D.N.Y. 2023) (*see* SPA-1-18). The court determined that Plaintiff

14

lacked standing to challenge Defendants' failure to enforce the NSA requirements against third parties on the rationale that "plaintiff lacks a judicially cognizable interest in the prosecution or nonprosecution of another, and therefore lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Neurological Surgery Practice of Long Island, PLLC*, 682 F.Supp.3d at 257, quoting *United States v Texas*, 599 U.S. 670 (2023). However, the court concluded plaintiff did have standing to challenge Defendants' "failure to abide by their own statutory obligations under the act." (682 F.Supp.3d at 258). "The act requires plaintiff to work through the federal IDR system to receive payment for out-of-network services. Defendants failed to abide by certain obligations under the act, which resulted in a backlog of disputes, severe delays, and rejection of claims that should be eligible for IDR. This has caused plaintiff harm in the form of unpaid or delayed reimbursement for medical services, and deprived plaintiff of the opportunity to contest health care plans' initial offers of payment." *Id*.

Nevertheless, the court dismissed Plaintiff's APA causes of action based on its conclusion that Plaintiff failed to identify a discrete action not taken by Defendants. The court reasoned that the mandate requiring Defendants to establish an IDR process by December 27, 2021 was "not specific enough to support plaintiff's claim under APA 706(1)" (*Id.* at 259). "Defendants have undisputedly

15

established an IDR process – it's just not one that plaintiff thinks (seemingly for good reason) is effective." *Id.* at 260. The failure to comply with deadlines was not deemed sufficient to support a claim because the "provisions are directed to the regulated entities[,] . . . not the government agencies charged with administering the act." *Id.* With respect to the failure to certify enough IDR entities to handle the volume of disputes, the court resolved that an APA claim was unavailable on the ground that the statute does not "require[e] defendants to certify a certain number of IDR entities." *Id.* at 261. As for the refusal to consider certain claims on the erroneous ground that they fall within the scope of the New York legislation, the court concluded "plaintiff has not pointed to any provision of the act that requires defendants to compel arbitration of these claims" and "[i]n any event, it is the IDR entities, not defendants, who are charged with making eligibility determinations." *Id.* at 262.

Finally, the court determined Plaintiff had not pleaded cognizable due process and Taking claims. *See id.* at 262-64. The court reasoned that Plaintiff failed to identify a federally-protected property right, concluding Plaintiff had no right to reimbursement for its services protected by the constitution, and that Plaintiff did not show a deprivation of that right by the government. "To the extent that health care plans have lowballed medical providers, with below-cost offers or failed to pay providers on time, those are decisions made by the plans – not the government." *Id.*

16

at 263. The court concluded that no takings claim had been pleaded because Plaintiff "still has an avenue to obtain payment for their services." *Id.* at 264, citing *Haller v. U.S. Dep't of Health & Hum. Servs*, 621 F.Supp.3d 343 (E.D.N.Y. 2022) (internal quotation marks omitted). "[W]hile the Act prohibits out-of-network providers from balance billing patients covered by the Act, it also gives providers a right to recover the value of the services provided directly from insurers and creates a process to adjudicate that right" and even if "health care plans have delayed or refused payment . . . that is not a taking by the government." *Id.* (emphasis removed). The court granted Plaintiff leave to file an amended complaint. *Id.*

Plaintiff filed its amended complaint on July 31, 2023, reframing the claims. In the amended complaint, Plaintiff asserted that Defendants violated the APA and All Writs Act by: Failing to obey the Congressional mandate that the Departments "shall ensure that a sufficient number of [IDR] entities are certified . . . to ensure the timely and efficient provision of [IDR] determinations" 42 U.S.C. § 300gg-111(c)(4)(E); and wrongfully determining that the New York Surprise Bill Law is a specified state law under the NSA for all "non-emergency services provided by an out-of-network provider at an in-network facility or surgical center." (A-234-244). The amended complaint also alleged that out-of-network physicians have a federally protected property right in receiving payment for their services, and that Defendants,

17

through their failure to administer a timely and efficient IDR process, deprived the physicians of this right in violation of the Fifth Amendment. (A-238-240).

Plaintiff sought reconsideration after filing the amended complaint, arguing that it had cured the deficiencies raised by the court in its July 17 order and the amended complaint sufficiently stated a claim upon which relief can be granted. (A-296-297, 298-316).

Defendants again sought dismissal of the amended complaint for failure to sufficiently state claims for relief under federal law, mainly on the ground that the narrowed claims were a repetition of the already-dismissed claims. (A-317-319). Defendants also argued that Plaintiff's complaint should be dismissed as moot because Defendants had ended the pause on the IDR portal and reinstated the rules for the processing of all claims. (A-512-514).

Plaintiff opposed, arguing that the amended claims were distinct from those asserted in the original complaint and were thus unaffected by the July 17 order. (A-320-348). Plaintiff argued that Defendants' admitted failure to certify a minimally adequate number of IDR entities falls squarely within the purview of the APA, which permits the court to compel agency action unlawfully withheld or unreasonably delayed. (A-328-335). Plaintiff further explained that the amended claim that Defendants wrongful refusal to consider certain claims under the federal NSA based on their incorrect interpretation of the scope of the New York surprise billing law

also falls under the APA because Defendants and its agent IDR agencies are rendering legally incorrect determinations of ineligibility that contradict the language of the NSA. (A-336-341). Finally, due to the combined effect of the law's prohibition on billing patients and Defendants' failure to implement a functioning IDR system, plaintiffs reasserted that Defendants are depriving Plaintiff of its federally protected right to be paid for services rendered. (A-341-347).

Plaintiff again sought a preliminary injunction on the same grounds (A-364-379); Defendants opposed. (A-380-408).

Before the court issued a decision on the motion to dismiss and renewed application for a preliminary injunction, Defendants submitted a "Notice of Resumption of Full IDR Process Operations." (A-512). They claimed that the full resumption of portal operations mooted the claims in the amended complaint. (A-512-514). Plaintiff opposed Defendants' mootness argument in its own letter, explaining that a defendant's voluntary actions cannot moot a case unless it is absolutely clear that the wrongful behavior cannot be expected to recur. (A-515-516).

In an April 1, 2024 Memorandum Decision and Order (Cogan, J.), the court dismissed the amended complaint as moot and denied plaintiffs' renewed application for a preliminary injunction (SPA-19-22). The court noted that "the portal has been up and running since last October for the vast majority of claims and became

19

operational for all claims on December 15, 2023" and concluded "there [wa]s nothing in the record to suggest that the new process is inadequate to handle the previously-unanticipated number of claims," that concerns raised in other courts "have not been accommodated in the new rules," or that "if some other practical infirmity arises, it cannot be dealt with without the kind of global pause that was implemented here at the inception of the portal" (SPA-21).

Plaintiff moved for reconsideration, arguing, among other things, that the case was not moot because live controversies remained that the court had not addressed in its decision, including Defendants' refusal to correct their inaccurate determination that certain claims were ineligible for adjudication under the federal IDR process and Defendants continuing failure to comply with the requirements for certifying IDR entities. (A-517-527). Defendants opposed. (A-528-543).

The court denied the motion, concluding that no new facts or law were raised that the court failed to consider in its mootness adjudication (SPA-25). Nonetheless, the court also addressed the merits, concluding that Plaintiff's argument that Defendants violated the APA fails because the APA does not mandate that Defendants take any discrete actions to ensure that the IDR process established is efficient, just that they establish a process (SPA-26-27). The court indicated it could not compel Defendants to take actions that the court believed would make the IDR process run more efficiently (SPA-28). Plaintiff appeals.

20

## SUMMARY OF ARGUMENT

Both Congress and the courts have recognized that Defendants have failed at every step of implementing the NSA. Defendants have taken action to correct some of the flaws in the IDR process, largely upon prompting by the judiciary, but their efforts have been woefully insufficient. As relevant here, Defendants have failed to certify anywhere near enough IDR entities to process the overwhelming number of claims that have been submitted, as statutorily mandated; allowed statutory deadlines to be ignored—and delayed disposition and untimely payment of successful IDR claims to become the norm—without repercussion; and, when interpretive guidance that led to wrongful determinations of eligibility was shown to be contrary to law during the course of this litigation, Defendants quietly deleted the guidance from its website without correcting the mistake by substituting corrected guidance or otherwise notifying IDR entities or health plans, allowing for the continued impression that certain claims incorrectly fall under the New York Surprise law, leading to the continued rejection of eligible claims.

The District Court held that all of these claims are mooted by the reopening of the IDR portal. But this determination was founded on an incorrect application of the facts and the law. Defendants failed to meet the heavy burden of showing that their failings were not likely to recur, and, in any event, the court failed to explain

21

how the opening of the portal fully resolved these claims—and in fact it did not. Accordingly, the court should not have dismissed the amended complaint as moot.

The court stated, however, that had it reached the merits, it would have dismissed the claims in any event. This was error. Congress created a scheme by which providers are precluded from billing patients and must rely on the IDR process for reimbursement for medically necessary services they provided. In doing so, Congress imposed various statutory mandates including strict time requirements for each step in the IDR process and a requirement that Defendants certify sufficient IDR entities to process claims in a timely manner. As explained in detail below, Defendants have failed to comply with these clear mandates, causing injury to Plaintiff's economic interests, and Plaintiffs have stated cognizable claims under the APA and the constitution. Plaintiff does not seek to control the manner in which Defendants fulfill their obligations but asks this Court to recognize that Plaintiff has asserted cognizable claims under the APA for an order compelling Defendants to fulfill Congress's directives. Finally, although Defendants removed inaccurate eligibility guidance from its website in an apparent effort to moot Plaintiff's meritorious challenge to its interpretive statement, this half-measure was insufficient to afford complete relief. Having misled IDR entities and health plans, who continued to reject eligible claims after deletion of the erroneous guidance, Plaintiffs

22

should be permitted to pursue their claim seeking an order compelling Defendants to issue corrected guidance.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss under Rule 12(b)(6) de novo, "construing the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in plaintiff's favor." *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 48-49 (2d Cir. 2018). The complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

### THE DISTRICT COURT ERRED IN DISMISSING THE AMENDED COMPLAINT ON GROUNDS OF MOOTNESS, STANDING, AND ON THE MERITS.

### A. The District Court Erroneously Dismissed the Amended Complaint for Mootness.

The District Court dismissed the amended complaint as moot based solely and erroneously on the fact that, after a lengthy pause in the processing of IDR requests, the IDR portal was reopened in December 2023. This was error. Even assuming

23

that the reopening of the portal mooted Plaintiff's challenge to the closure of the portal and its request, as relief, that the portal be reopened (and this is not clear), it did not undermine the justiciability of the other claims Plaintiffs continue to assert.

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome . . . and it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (cleaned up). A case may become moot "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party," *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) or "subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n.*, 393 U.S. 199, 203 (1968). The "heavy burden" of persuading a court that the challenged conduct will not recur is on the party asserting mootness. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

While closure of the portal certainly caused additional delays, it was only one of many factors contributing to the absence of a functional IDR process. The reopening of the portal did not impact Plaintiffs' claim seeking compliance with the mandatory time requirements for disposition and payment of claims (addressed in Subpoint B). Rampant noncompliance with time requirements occurred while the

24

portal was open (prior to the pause) and has continued since it reopened.[8]  Likewise, the Departments' failure to certify anywhere near enough IDR entities (by their own metrics) was not ameliorated by the reopening of the portal.  Contrary to the District Court's statement that "[t]here is nothing in the record to suggest that the new process is inadequate to handle the previously-unanticipated number of claims," (SPA-21) there is ample basis in the record to conclude just the opposite.  The reopening of the portal did not create a "new process" alleviating the need for an adequate number of arbitrators and Defendants have never disputed that only a fraction of the number of arbitrators needed have been certified.  Finally, the reopening of the portal in no way eliminated the harm caused by Defendants' erroneous interpretive guidance on eligibility of claims under the New York Surprise Bill Law, which resulted in the unlawful rejection of claims covered by the NSA, and which has not been corrected by clarifying guidance.  It was Defendants' burden to prove that intervening events mooted Plaintiffs' claims and it failed to do so.

In its decision, the District Court mentioned the "concerns expressed by the court in the Eastern District of Texas," a reference to the decisions in *Texas Medical Ass'n v. U.S. Dep't of Health and Human Servs.*, 654 F. Supp. 3d 575 (E.D. Tex.

---

[8] *See* March 18, 2024 Letter from Congress of the United States, https://kslawemail.com/email_handler.aspx?sid=0f8ed525-7e8a-4ee3-ae8f-8ac0cb493497&redirect=https%3a%2f%2fwenstrup.house.gov%2fuploadedfiles%2fno_surprise s_act_implementation_3.18.23.pdf&checksum=E4C8AC61 (last accessed November 13, 2024).

2023) and *Texas Medical Ass'n v. U.S. Dep't of Health and Human Servs.*, 587 F.
Supp. 3d 528 (E.D. Tex. 2022), which invalidated rules curtailing arbitrators'
discretion in determining payment amounts. Those cases did not involve claims
similar to the claims asserted by Plaintiffs here relating to the number of certified
IDR entities, the timeliness of IDR disposition and payment, and the Departments
faulty interpretive guidance. No relief was granted in those cases that would correct
any of these deficiencies in the Departments' implementation and administration of
the IDR process.

Even assuming that the Departments' rule changes (which addressed other
issues) and portal reopening impacted Plaintiff's requested relief, "[i]t is well settled
that a defendant's voluntary cessation of a challenged practice does not deprive a
federal court of its power to determine the legality of the practice." *Friends of the
Earth, Inc.*, 528 U.S. at 189 (internal quotation marks and citation omitted). "[I]f it
did, the courts would be compelled to leave '[t]he defendant . . . free to return to his
old ways.'" *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10
(1982). Persuading a court that the challenged conduct cannot reasonably be
expected to recur is a heavy burden that rests with Defendants. *See Friends of the
Earth*, 528 U.S. at 189.

26

Defendants here have failed to show that the challenged issues in the IDR process have been resolved, much less that they will not recur and clearly failed to meet the "formidable burden" of establishing mootness. *See Id.* at 190.

**B. The District Court Erroneously Dismissed Plaintiff's Cause of Action for Enforcement of Compliance with Statutory Deadlines.**

Upon Plaintiff's initial motion to dismiss, the District Court determined that Plaintiff lacked standing to challenge the Departments' failure to enforce the NSA requirements on the rationale that "plaintiff 'lacks a judicially cognizable interest in the prosecution or nonprosecution of another,' and therefore 'lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" 682 F.Supp.3d 249, 257, quoting *United States v. Texas*, 599 U.S. 670, 674 (2023). This was error. *United States v. Texas* involved the Executive Branch's exercise of discretion over whether to arrest or prosecute immigration offenses, a classic prosecutorial prerogative. In this case, Plaintiffs are not asking the courts to interfere with agencies' exercise of discretion but are seeking adherence to clear Congressional mandates.

The NSA generally prohibits providers from billing patients for services provided, requiring providers to seek payment from health plans through the IDR process. *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv)(II), 300gg-111(b)(1)(D). The IDR process contains mandatory time frames within which these claims are to be resolved and payment provided. Critical to this dispute, the statute requires, that

27

once an IDR entity is selected to resolve the dispute, it must issue a decision. The statute provides: "Not later than 30 days after the date of selection of the certified IDR entity . . . the certified IDR entity shall . . . select one of the offers submitted . . . to be the amount of payment . . . ; and notify the provider . . . and . . . health plan." *Id.* at § 300gg-111(c)(5)(A). Similarly, the statute imposes a strict time limit for the payment of claims: "The . . . payment . . . for which a determination is made under paragraph (5)(A) . . . shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." *Id.* at § 300gg-111(c)(6).

Defendants have taken no action to address either the rampant failure of IDR entities to issue timely determinations or the refusal of health plans to comply with payment directives when providers prevail in IDR. The result is that, as of March 2023, more than 91% of the 2022 IDR claims remained unadjudicated. (A-65). In addition, 87% of payers have failed to pay in accordance with IDR additional payment determinations and 1/3rd of providers have not received reimbursement for *any* of their winning IDR decisions. *See* Emergency Department Practice Management Association ("EDPMA"), No Surprises Act Independent Dispute Resolution Effectiveness, https://edpma.org/wp-content/uploads/2023/03/EDPMA-Data-Analysis-No-Surprises-Act-Independent-Dispute-Resolution-Effectiveness-1.pdf (last visited on November 18, 2024).

28

While the District Court concluded that all that was required was that Defendants "shall establish an IDR process" (SPA-10), in fact Defendants were required to create the particular IDR process specified in the NSA. As implemented and administered the current system bears little to no resemblance to the one directed by Congress. This is due, in large part, to Defendants steadfast refusal to responsibly administer the program and their penchant for throwing up their hands and placing blame on IDR entities and health plans—so-called "third parties" they contend are beyond their control. (A-205). While IDR entities engage in independent decision-making, they function as agents of the Departments; rather than employing hearing officers to perform the administrative adjudication, the process is outsourced to certified IDR entities. But the fact remains that Defendants are administering an adjudicative process that supplanted traditional claim recovery and dispute resolution processes that were available to providers before its enactment. *See generally*, *Haller v. U.S. Department of HHS*, 621 F. Supp. 3d 343, 355 (2002), *aff'd in part rev'd in part* 22-3054, 2024 WL 290440 (2d Cir. 2024). "[T]he Departments do protest too much in relying on arbitrator's asserted independence"—the Departments can and have exercised their administrative authority in a manner that has "a determinative or coercive effect on arbitrators." *Texas Med. Ass'n*, 110 F.4th at 774 (internal quotation mark omitted).

29

"Where a statute delegates authority to an agency, the role of the reviewing court under the APA is to fix the boundaries of the delegated authority and ensure the agency has engaged in reasoned decisionmaking within those boundaries." *Id.*, quoting *Loper Bright Enters. v. Raimondo*, ___ U.S. ___, 144 S. Ct. 2244, 2263 (2024) (internal brackets and quotation marks omitted). The chronic failure of IDR entities to meet the mandatory time requirements is administrative action chargeable to the Departments, which have the coercive power to take steps to address it, and their failure to require IDR entities to comply with statutory mandates is not reasoned decision-making—it is arbitrary, capricious and contrary to law. The NSA does not delegate authority to the Departments to alter or ignore the mandatory time requirements.

The District Court's reliance on *United States v. Texas*, 599 U.S. 670, for the proposition that judicial review is unavailable here was misplaced. Under the APA, "[a]ny person 'adversely affected or aggrieved' by agency action; *see* § 702, including a 'failure to act,' is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which there is no other adequate remedy in a court,' *see* § 704," if, as relevant here, the action or inaction is not "committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). While in some circumstances an agency decision not to take enforcement action may be unreviewable, even where a presumption of unreviewability applies it "may be

rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers," i.e., where the agency's discretion is limited. *Id.* at 833. "If [Congress] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under [APA] § 701(a)(2), and courts may require that the agency follow that law." *Id.* at 834–35.

Here, requiring the Departments to administer the IDR process under the mandatory time frames set forth in the NSA is not analogous to the types of "enforcement" actions contemplated in "presumption of unreviewability" cases such *Chaney* and *Texas*, which involved agency decisions not to initiate civil or criminal investigative or enforcement proceedings. Such decisions involve balancing several complex discretionary factors, including whether an underlying statute was violated and whether such a violation could be proved. *Chaney*, 470 U.S. at 831-832. Here, noncompliance with mandatory time requirements is readily discernible and no separate proceedings would be required for the Departments to require certified IDR entities and regulated health plans to follow the rules. These requirements are part and parcel of the IDR process and providers like Plaintiffs have a direct monetary interest in prompt resolution of billing disputes—they are not suing to vindicate some abstract interest in seeing others prosecuted.

But even assuming that line of authority is implicated here, this situation would fall neatly within the exception to the presumption. Here, Congress reasonably mandated that an IDR entity must issue a decision within 30 days and, if additional reimbursement is granted to a provider, requires that the additional reimbursement must be provided within 30 days of a decision. 42 U.S.C. §§ 300gg-111(c)(5)(A), 300gg-111(c)(6). Plaintiff does not ask the court to interfere in the discretionary process of determining the appropriate amount of reimbursement but seeks an order compelling the Departments to enforce the mandatory time frames selected by Congress. This is exactly the type of enforcement for which *Chaney* left room. *See National Wildlife Federation v. U.S. E.P.A.*, 980 F.2d 765, 774 (D.C. Cir. 1992) (holding that the unreviewability presumption was rebutted where review focused on what an agency may do following a determination of noncompliance and did not require delving into the decision-making process in the first instance). As the Supreme Court stated in *Chaney*, "in establishing th[e] presumption in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers." *Chaney*, 470 U.S. at 833.

Moreover, here Plaintiff has clearly established standing, which requires that (1) the plaintiff have suffered an "injury in fact"; (2) there is a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to speculative, that "the injury will be redressed by a favorable decision."

32

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The District Court agreed that Plaintiff had shown an actual, concrete injury in the form of delayed or unpaid payments (SPA- 5).

Previously providers could "balance bill" patients but the NSA prohibits recovery of fees from patients. When it enacted the NSA, "Congress limited the economic impact on providers by giving them the right to recover the value of their services directly from insurers and established the negotiation and IDR process to adjudicate that right." *Haller*, 621 F.Supp.3d at 360-361. Plaintiff has a statutory (if not constitutional) right to prompt adjudication and payment of these claims and clearly has standing to challenge deprivation of that right.

Under New York law, even in the absence of a contract, a physician is entitled to be reimbursed for services rendered at the request of a patient, *see McGuire v. Hughes*, 207 N.Y. 516, 521-22 (1913); *Crouse Irving Hosp. v. City of Syracuse*, 283 App. Div. 394, 128 NYS2d 433 (4th Dept. 1954), *aff'd*, 308 N.Y. 844, 126 N.E.2d 179 (1955), and this cognizable property interest is protected against unlawful federal interference under the due process and takings clauses of the Fifth Amendment. The NSA was intended to replace the existing right to pursue direct reimbursement from the patient with a right to pursue recovery from the patient's health plan via an expeditious negotiation and mandatory arbitration process. Based on the allegations here that a meaningful reimbursement process has been denied to

33

providers due to Defendants' failure to implement a functioning system in the manner compelled by Congress, the balance struck in the legislation has been destroyed. As such, Plaintiff also has demonstrated standing to pursue its cognizable constitutional claims.

Last, the court did not address redressability, but Plaintiff has established it. Under the NSA outlines, an IDR decision must be made within 30 days of initiation of the proceeding by either party and, if an IDR entity grants additional reimbursement to a provider, it requires that the additional reimbursement be paid to the prover within 30 days of a decision. 42 U.S.C. §§ 300gg-111(c)(5)(A), 300gg-111(c)(6). "When an agency fails to meet a concrete statutory deadline, it has unlawfully withheld agency action." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir. 1999). If the court determines that Defendants unlawfully withheld agency action, it may compel compliance with statutory deadlines so that Plaintiff and other providers will be timely reimbursed. Accordingly, Plaintiff has standing to bring these causes of action against Defendants.

## C. The District Court Erred in Dismissing Plaintiff's Claim that Defendants Violated the Congressional Mandate that Defendants Ensure Certification of a Sufficient Number of IDR Entities.

Under the NSA, Defendants were charged with establishing an IDR process to resolve disputes regarding the reimbursement of out-of-network medical claims. 42 U.S.C. § 300gg-111(c)(2)(A). The NSA provides: "Not later than 1 year after

34

[the date of the enactment of this subsection], [Defendants] shall establish by regulation one independent dispute resolution process . . . under which, . . . a certified IDR entity . . . determines, . . . the amount of payment under the plan or coverage for such item or service furnished by such provider or facility." *Id.* The NSA outlines, in detail, the features of the IDR process, including deadlines by which actions must be taken. Under the NSA, Congress directed that Defendants "*shall* establish a process to certify (including to recertify)" IDR entities and "*shall* ensure that a sufficient number of [IDR] entities are certified . . . to ensure the timely and efficient provision of [IDR] determinations." *Id.* § 300gg-111(c)(4)(E) (emphasis added). There can be no dispute that Defendants have failed to comply with this mandate – certainly Plaintiffs have adequately alleged facts supporting such a claim.

Defendants admitted that, regardless of the portal closure, they failed to certify anywhere near enough IDR entities. Defendants determined that one certified IDR entity was needed for every 440 proceedings. (A-178). But at the time the amended complaint was filed, the ratio of certified IDR entities was one for every 25,756 proceedings. (A-225). The actual volume of IDR proceedings brought—by defendants' own admission—is 15.2 times higher than they projected. (A-225). But even excluding the unanticipated volume, the number certified would have fallen well short of the number required.

35

This failure, admitted by Defendants, made out a cognizable claim under 5 U.S.C. § 706(1). Section 706 provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Supreme Court has interpreted this section of the APA as requiring a showing that a federal agency failed to take a "*discrete* agency action that [an agency] is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). This is precisely what Plaintiff has alleged here.

The requirement that the Departments "*shall* ensure that *a sufficient number* of [IDR] entities are certified to ensure the timely and efficient provision*" of IDR determinations, 42 U.S.C. § 300gg-111(c)(4)(A) and (E) (emphasis added), is a discrete requirement stated in mandatory terms. The term "shall" admits of no discretion. Plaintiff's claim in this regard does not require second-guessing concerning what number of IDR entities is sufficient to adjudicate a particular number of disputes. The Department has determined the necessary ratio of IDR entities to disputes and, by their own metrics, the mandate has not been fulfilled.

Action that an agency is legally required to take can be compelled under the APA. *Norton*, 542 U.S. at 63. Congress required that there be enough IDR entities "to ensure the timely and efficient provision of [IDR] determinations." 42 U.S.C. § 300gg-111(c)(4)(E). There, undisputedly, are not.

36

Plaintiff is not asking the Court to curtail Defendants discretion by identifying particular steps Defendants are required to take to comply with the statute, just that they *take any steps* to fulfill the statutory requirement. This is well within the purview of the Court's authority under the APA. *See Norton*, 542 U.S. at 65 (explaining that a requirement that the FCC "establish regulations to implement" requirements within six months of enactment as supporting "a judicial decree under the APA requiring the prompt issuance of regulations, but not a judicial decree setting forth the content of those regulations.").

The District Court misunderstood Plaintiff's claim when it suggested Plaintiff had not complained about a failure to act but, instead, was merely unhappy with the action that Defendants took. The specific claim relating to the failure to meet the IDR certification mandate is not fairly labeled as nothing more than a request for "wholesale improvement of a program, which cannot be done by court decree." (SPA-1). Plaintiff is not asking the court to take some amorphous action that would impede the discretion of the agency—it is seeking an order compelling the Departments to fulfill Congress's IDR certification directive, by whatever means they deemed appropriate. Such a claim is cognizable under the APA.

**D. The District Court Erroneously Held that it Could Not Require Defendants to Provide Clarifying Guidance.**

The District Court held that Plaintiff's claim seeking correction of the Department's unlawful guidance relating to the eligibility of certain claims for

37

resolution under the New York Surprise Bill Law failed to state a claim on the rationale that a court cannot compel Defendants to issue clear and accurate guidance. This was error because, under the circumstances presented in this case, the court had authority under the APA to do so.

The NSA makes certain claims that would otherwise be covered by the statute ineligible for resolution under the federal IDR process if the state in which the claim arose has a "specified state law" – a state law providing a dispute resolution process for surprise billing -- that would cover that claim. 42 U.S.C. § 300gg-111(a)(3)(I). In other words, the NSA favors resolution of a dispute under a state IDR process if one is available that covers the particular claim. New York has a surprise billing law with an IDR process that predates the NSA. However, as the District Court acknowledged, certain claims generally eligible for federal IDR are not eligible for adjudication under the New York law, specifically the New York law "provides that a claim is *ineligible* for New York IDR if it concerns an elective procedure performed in a hospital by an out-of-network provider on a New York-regulated health plan beneficiary who was aware before arriving in the hospital that the provider was out-of-network but chose to proceed anyway." (SPA-13) (*See* N.Y. Fin. Serv. L. §§ 601-08.). Despite this, on the NSA's public website, in its subregulatory guidance, Defendants inaccurately stated that the New York Surprise Bill Law is a "specified state law" under the NSA – meaning its IDR process is the

38

appropriate forum -- for all "non-emergency services provided by an out-of-network provider at an in-network facility or surgical center," (A-228-229), overstating the scope of the New York law. Health Plans sought dismissal of claims that were eligible for federal IDR – and IDR entities dismissed those claims – based on that inaccurate guidance. The result was that providers were placed in a state of limbo where they were unable either to balance bill patients or to pursue payment through either the state or the federal IDR process, leaving them without a means of obtaining compensation for services rendered. In the original complaint, Plaintiff sought an order compelling the Departments to follow the provisions of the NSA and permit the class of claims not covered by the New York law -- those where the patient "was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway" – to be submitted to the federal IDR process for disposition. (A-27, 36, 44).

Plaintiff subsequently raised the same claim in its amended complaint, seeking an order directing the Departments to issue a determination and post it on their website clarifying that the class of claims at issue were not covered by a "specified state law," meaning they were eligible for resolution under the NSA. (A-235-236). Fifteen days after the filing of the Amended Complaint, Defendants notified the court that they were engaged in discussions with New York's Department of Financial Services to clarify the scope of the New York law and "will

39

issue updated guidance providing additional clarification, if necessary" (A-523-524). Thereafter, implicitly recognizing it was contrary to law, Defendants removed the erroneous interpretive guidance relating to the scope of the New York law from their website, but did so without "issu[ing] updated guidance" (as it had advised the court it would do) or otherwise notifying IDR entities or health plans of the change in policy. As a result, even after the guidance was removed, claims continued to be improperly rejected on the rationale they were covered by the New York law.

The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "Agency action" includes "the whole or a part of an agency rule" and a "rule" includes "an agency statement of general or particular applicability . . . designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4), (13). The Department's inaccurate interpretive guidance relating to claim eligibility under the New York surprise billing law was a "rule" subject to challenge under the APA. There can be little question that, had that guidance not been withdrawn by Defendants—had District Court adjudicated Plaintiff's claim and determined that the guidance was arbitrary, capricious and contrary to law—a court order directing correction of the interpretive guidance would have been an appropriate judicial remedy. It is no less an appropriate remedy here where Defendants unilaterally removed the interpretive guidance from their

40

website while this action was pending and before the court could address Plaintiff's claim that, as Defendants now concede, the guidance was inaccurate and misleading. Plaintiff has alleged that it was harmed by the inaccurate guidance as it was relied on by health plans to wrongly challenge certain of Plaintiff's claims as ineligible for adjudication under the NSA (due to the purported availability of a state forum) and followed by IDR entities that dismissed claims on that basis. Further, the removal of the inaccurate guidance without notice of the change in policy or clarification of the governing law has left Plaintiff without complete relief because, unaware of the Department's changed interpretation, claims that are eligible for resolution under the federal NSA continue to be challenged and dismissed as ineligible.

Defendant's failure to issue proper clarification entitles Plaintiff to proceed on its claim seeking an order directing Defendants to take all steps necessary to correct its erroneous determination, including providing clarified guidance. *See* 5 U.S.C. § 706(2)(A, C). *See Make the Road New York v. Pompeo*, 475 F.Supp.3d 232, 259-60 (S.D.N.Y. 2020) (issuing preliminary injunction where Rule conflicted with the APA); *New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 342 (S.D.N.Y. 2019) (same). Thus, the claim should not have been dismissed.

## CONCLUSION

**WHEREFORE**, based upon all the foregoing, Plaintiff respectfully requests that this Court enter an order vacating the District Court's Judgment, denying the

motion to dismiss, and remanding for consideration of Plaintiff's motion for a

preliminary injunction.

Dated: November 20, 2024           **HARRIS BEACH PLLC**
       Uniondale, New York

By: _____
      Roy W. Breitenbach
      333 Earle Ovington Boulevard
      Uniondale, New York 11553
      (516) 880-8484
      rbreitenbach@harrisbeach.com

**CERTIFICATION**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I, Roy W. Breitenbach, certify that the foregoing Appellant's Brief complies with type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and said document contains no more than 9,463 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and further complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point "Times New Roman" font.

Dated: November 20, 2024
     Uniondale, New York

**HARRIS BEACH PLLC**

By: _____
Roy W. Breitenbach
333 Earle Ovington Boulevard
Uniondale, New York 11553
(516) 880-8484
rbreitenbach@harrisbeach.com

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

So-Ordered Memorandum Decision and Order,
dated July 16, 2023 ................................................ SPA-1

So-Ordered Memorandum Decision and Order,
dated March 30, 2024 ........................................... SPA-19

Judgment, dated April 3, 2024 .................................. SPA-22

Order, dated June 10, 2024 ....................................... SPA-23

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
NEUROLOGICAL SURGERY PRACTICE          :
  OF LONG ISLAND, PLLC,                        :          **MEMORANDUM DECISION AND**
                                                               :          **ORDER**
                                       Plaintiff,        :
                                                               :          23-cv-02977 (BMC)
                       - against -                        :
                                                               :
                                                               :
UNITED STATES DEPARTMENT OF          :
HEALTH AND HUMAN SERVICES, *et al.*,   :
                                                               :
                                       Defendants.     :
                                                               :
-------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff Neurological Surgery Practice of Long Island, PLLC brings this action against

the United States Department of Health and Human Services, Department of the Treasury,

Department of Labor, and high-level officials of those agencies.  It alleges that defendants have

failed to lawfully implement the No Surprises Act, Public Law No. 116-260 ("NSA"), in

violation of the Administrative Procedure Act, 5 U.S.C. § 706, *et seq.*, and the Fifth Amendment.

      Presently before the Court are defendants' motion to dismiss and plaintiff's motion for a

preliminary injunction.  It is clear that the statutory scheme, as implemented, does not live up to

plaintiff's expectations.  However, it is not the province of this Court to order a reworking of a

legislative and executive program.  See Norton v. S. Utah Wilderness All., 542 U.S. 55, 64

(2004) ("SUWA") (rejecting attempts at "wholesale improvement of [a] program by court

decree, rather than in the offices of the Department[s] or the halls of Congress, where

programmatic improvements are normally made").  Plaintiff is essentially asking this Court to

rewrite the statute to make it do what plaintiff believes Congress intended it to do.  Because the

SPA-2

Court cannot do that, defendants' motion to dismiss is granted and plaintiff's motion for a preliminary injunction is denied as moot.

## BACKGROUND

Plaintiff is a private neurosurgery practice that provides out-of-network medical services to enrollees of major health plans. Since January 2022, plaintiff's provision of these services has been governed by the NSA.[1]

The NSA prohibits out-of-network health care providers from billing health plan members directly for certain items or services. See 42 U.S.C. §§ 300gg-131(a) (emergency services); 300gg-132 (non-emergency services). A provider must instead seek compensation from the patient's health care plan. Under the act, upon receiving a request for payment from a provider, the patient's health care plan determines whether and in what amount it will pay for the services. If the provider and health care plan cannot agree on an amount, the act provides for an independent dispute resolution ("IDR") process in which a private arbitrator ("IDR entity") selects between amounts submitted by the provider and the health plan.

The NSA provides deadlines for various steps in the process. A health care plan's initial payment decision must be made within 30 calendar days after the out-of-network provider transmits its bill to the health plan. Id. at § 300gg-111(a)(1)(C)(iv)(I). If there is a dispute between the health plan and the provider regarding the proper reimbursement amount, there is a 30-day open negotiation period. Id. at § 300gg-111(c)(1)(A). If negotiations are unsuccessful, and there is no specified state law that applies to resolve the parties' dispute, a party wishing to

---

[1] Congress passed the NSA in December 2020 and the act took effect on January 1, 2022. The federal IDR scheme was then put on hold for several months as a result of litigation challenging the department's IDR methodology. See e.g., Texas Med. Ass'n v. United States Dep't of Health and Human Servs., No. 6:22-cv-372, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023). The IDR process began again in February 2023.

bring an IDR proceeding must do so within 4 days.  Id. at § 300gg-111(c)(1)(B).  The IDR entity

must render a decision within 30 days, which is binding on the parties "in the absence of a

fraudulent claim or evidence of misrepresentation of facts presented" and is subject to limited

judicial review under the Federal Arbitration Act.  Id. at § 300gg-111(c)(5)(A) and (E).  A health

care plan must pay any additional reimbursement ordered by the arbitrator to the provider within

30 days of the decision.  Id. § at 300gg-111(c)(6).

     In what should surprise absolutely no one under this complex and short time periods

scheme, a backlog of disputes awaiting resolution has accumulated in the year-and-a-half since

the NSA has been implemented.  Plaintiff alleges that these delays are the result of defendants'

failure to lawfully implement the act, and that it has suffered substantial harm in the form of

unpaid or delayed reimbursement from health care plans.  Plaintiff also contends that defendants

have improperly allowed certain claims to be rejected by arbitrators as ineligible for federal IDR,

and that the agencies have failed to allow reasonable "batching" of similar claims in a single IDR

proceeding.

     Plaintiff seeks a preliminary injunction compelling defendants to take the following

actions:

- Direct health plans subject to the No Surprises Act to either make an initial
payment to the provider or issue of notice of denial of payment within 30 calendar
days after the out-of-network provider transmits its bill to the health plan, and
enforce compliance with this direction;

- Direct health plans subject to the No Surprises Act to make all initial payments
under the No Surprises Act to the out-of-network providers who rendered the
medical services, as opposed to the patients, and monitor compliance with this
direction;

- Direct health plans subject to the No Surprises Act to ensure that (i) the
explanation of benefits (EOB) forms required by the No Surprises Act be sent to

3

the out-of-network providers who rendered the medical services; (ii) these EOBs clearly indicate the issuing health plan's understanding whether the case is eligible for independent dispute resolution (IDR) under either federal or state law; and (iii) the EOBs report the health plans' proposed qualified payment amount (as defined according to the No Surprises Act) for each CPT code reflected on the EOB, and monitor compliance with these directions;

- Devote sufficient monetary and other resources required to ensure that the IDR process time frames established by the No Surprises Act are complied with;

- Direct health plans to take all steps necessary to ensure that the IDR process time frames established by the No Surprises Act are complied with, and monitor compliance with these directions;

- Establish a streamlined process for determining threshold eligibility issues, along with providing an explanation for why a dispute is eligible or ineligible for IDR so as to eliminate roadblocks in the IDR processing system;

- Allow a reasonable batching of similarly situated IDR claims;

- Follow the provisions of the No Surprises Act and require that reimbursement disputes relating to elective procedures performed in a New York state-located hospital, by an out-of-network provider, on a fully insured or otherwise state regulated health plan beneficiary, who was aware before he or she came to the hospital that the provider was out of network, but chose to proceed anyway, be accepted by and decided through federal IDR process;

- Direct health plans to pay additional reimbursement due providers, as determined through the IDR process, within 30 days, as required by the No Surprises Act, and monitor compliance with this direction; and

- Require the Departments to provide a status report to the Court weekly regarding compliance with this Order.

Defendants have moved to dismiss the complaint for lack of standing and failure to state a claim.

## DISCUSSION

### I.   Standing

A plaintiff has standing only if it has "(1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). The party

asserting jurisdiction must show "standing for each claim and form of relief sought." Baur v.

Veneman, 352 F.3d 625, 641 n.15 (2d Cir. 2003). "[A] district court must take all

uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of

the party asserting jurisdiction." Id. The court must also "accept as valid the merits of

[plaintiff's] legal claims." FEC v. Ted Cruz for Senate, 142 S. Ct. 1638, 1647 (2022); see also

Cohen v. Cannavo, No. 11-cv-5482, 2012 WL 3999846, at *6 (S.D.N.Y. Sept. 12, 2012) (the

Supreme Court "has made clear that when considering whether a plaintiff has Article III

standing, a federal court must assume *arguendo* the merits of his or her legal claim.").

     Given the varying forms of relief sought, it is necessary to distinguish between them for

purposes of deciding standing. See Baur, 352 F.3d at 642 ("[A] plaintiff who is injured by one

administrative deficiency does not necessarily obtain standing to challenge all similar

deficiencies." (citing Lewis v. United States, 518 U.S. 322 (1996))). In some of its requests,

plaintiff seeks to compel defendants to enforce various requirements of the act against IDR

entities and health care plans. Specifically, plaintiff requests injunctive relief requiring

defendants to monitor and enforce health care plans' compliance with the 30-day initial payment

deadline, the 30-day reimbursement deadline following an arbitrator's decision, and the

requirement that health care plans make payments to providers and not patients.

     To the extent plaintiff seeks to compel enforcement of the statutory deadlines or other

requirements of the act, it lacks standing to do so. Plaintiff has shown an actual, concrete injury

in the form of delayed or unpaid payments. See Stephens v. U.S. Airways Grp., Inc., 644 F.3d

437, 442 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("Money later is not the same as money

now."). But, as the Supreme Court recently reaffirmed, a plaintiff "lacks a judicially cognizable

interest in the prosecution or nonprosecution of another," and therefore "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" United States v. Texas, No. 22-58, 599 U.S. __, 2023 WL 4139000, at *7 (June 23, 2023); see also In re Attorney Disciplinary Appeal, 650 F.3d 202, 203-04 (2d Cir. 2011). Injuries stemming from a lack of prosecution or enforcement are simply "not the kind redressable by a federal court." Texas, 2023 WL 4139000, at *5. Because plaintiff is not itself threatened with prosecution or enforcement, it lacks standing to challenge defendants' exercise of discretion in enforcing the requirements of the act against IDR entities or health care plans.

The Supreme Court has recognized a limited exception to this general rule. As set forth in Heckler v. Chaney, 470 U.S. 821, 833 n.4 (1985), the Court has noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" Texas, 2023 WL 4139000, at *7.

Plaintiff argues that its claims fall within that exception. It contends that it is not challenging "Defendants' decision about which health plans and IDR entities warranted enforcement actions and which did not", but their "complete[] fail[ure] to do anything to enforce the statutory deadlines and other requirements that the Defendants themselves, the health plans, and the IDR entities were obligated to follow." Plaintiff cites statistics showing that over 95% of pending IDR proceedings have been outstanding more than five months. In addition, of those claims that are adjudicated in favor of a provider, 87% are not paid by the statutory deadline. Only 14% of providers' complaints have been acknowledged by defendants, with only 7% being decided against health plans. Defendants have also conceded that they have certified only 26%

6

SPA-7

of the IDR entities needed based on estimated volume, and that actual volume is 15.2 times what they anticipated.

Although plaintiff has made more than a plausible showing of rampant inefficiencies in the federal IDR system, that is not enough to invoke Chaney. Plaintiff must point to an *express* policy of nonenforcement, and it has not done so. See Salmon Spawning and Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1129 n.5 (Fed. Cir. 2008) (refusing to apply Chaney's exception because "plaintiffs ha[d] not alleged that there was any express policy of non-enforcement"); People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric., 7 F. Supp. 3d 1, 12-13 (D.D.C. 2013) (refusing to apply Chaney's exception absent "some kind of official, concrete statement of the agency's general enforcement policy").

However, in other requests for relief, plaintiff seeks to compel defendants to comply with their own obligations under the act. Plaintiff claims that defendants themselves have failed to follow the deadlines established by the act.[2] It also seeks an injunctive order requiring defendants to direct health plans to send EOB forms to providers (not just plan beneficiaries) and include certain information regarding eligibility and payment amount on that form. It also wants defendants to "[e]stablish a streamlined process for determining threshold eligibility issues" and provide an "explanation for why a dispute is eligible or ineligible for IDR." Plaintiff also demands that defendants allow "reasonable batching of similarly situated IDR claims" into a single IDR processing. Lastly, plaintiff argues that defendants have improperly allowed arbitrators to reject certain claims as ineligible for federal IDR based on an erroneous conclusion

---

[2] Although plaintiff's complaint is not entirely clear, it seems to contend that defendants have failed to enforce the statutory deadlines against health plans and IDR entities *and* that defendants have themselves failed to comply with these statutory deadlines.

SPA-8

that New York law serves as a "specified state law" that precludes federal IDR review for those claims.

Plaintiff has standing to bring these claims insofar as they relate to defendants' alleged failure to abide by their own statutory obligations under the act, not defendants' enforcement of the act against third parties. Again, for purposes of standing, I must assume *arguendo* that defendants are legally required to do what plaintiff says they are required to do. When I do that, it follows that plaintiff has shown that its injuries are fairly traceable to defendants' failure to take these actions. The alleged "causal nexus" is clear. See DiPizio v. Empire State Dev. Corp., 745 F. App'x 385, 388 (2d Cir. 2018). The act requires plaintiff to work through the federal IDR system to receive payment for out-of-network services. Defendants failed to abide by certain obligations under the act, which resulted in a backlog of disputes, severe delays, and rejection of claims that should be eligible for IDR. This has caused plaintiff harm in the form of unpaid or delayed reimbursement for medical services, and deprived plaintiff of the opportunity to contest health care plans' initial offers of payment.

Defendants contend that plaintiff has been harmed not by any conduct on the part of the agencies, but by the failure of IDR entities and health care plans to comply with statutory directives. But indirect injury is not fatal to standing so long as a plaintiff demonstrates a causal nexus between the alleged injuries and the defendants' conduct – and plaintiff has made that showing here. See Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013) ("Indirectness is not necessarily fatal to standing because the 'fairly traceable' standard is lower than that of proximate cause.").

For similar reasons, plaintiff's harm could likely be redressed by a favorable judicial decision. A plaintiff "need not show that a favorable decision will relieve his every injury."

8

<u>Larson v. Valente</u>, 456 U.S. 228, 244 n.15 (1982).  "All that is required is a showing that such

relief be reasonably designed to improve the opportunities of a plaintiff not otherwise disabled to

avoid the specific injury alleged."  <u>Huntington Branch, NAACP v. Town of Huntington</u>, 689

F.2d 391, 394 (2d Cir. 1982).  I am confident that if the Court were to order the departments to

take the actions requested by plaintiff, at least some of plaintiff's harms could be remedied.

## II.    <u>Plaintiff Fails to State an APA Claim</u>

Under APA § 706(1), a court may "compel agency action unlawfully withheld or

unreasonably delayed," but it may only do so if the plaintiff identifies a "*discrete* agency action

that [the agency] is *required to take*."  <u>SUWA</u>, 542 U.S. at 64 (emphasis in original).  In other

words, "§ 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-

discretionary act,' or 'to take action upon a matter, without directing how it shall act.'"

<u>Benzman v. Whitman</u>, 523 F.3d 119, 130 (2d Cir. 2008).  This "limitation [generally] precludes .

. . broad programmatic attack[s]," and "rules out judicial direction of even discrete agency action

that is not demanded by law."  <u>SUWA</u>, 542 U.S. at 65 (citing <u>Lujan v. National Wildlife</u>

<u>Federation</u>, 497 U.S. 871 (1990)).

Plaintiff first claims that defendants have failed to comply with the various deadlines set

forth in the NSA.  In support of this allegation, plaintiff points to 42 U.S.C. § 300gg-

111(c)(2)(A), which provides:

> Not later than 1 year after December 27, 2020, the [HHS] Secretary, jointly with
> the Secretary of Labor and the Secretary of the Treasury, shall establish by
> regulation one independent dispute resolution process[,] . . . under which, . . . a
> certified IDR entity . . . determines, . . . the amount of payment under the plan or
> coverage for such item or service furnished by such provider or facility.

Plaintiff argues that defendants have so utterly failed to implement a workable IDR system that they have failed to comply with the act's requirement that they "shall establish" an IDR process.

But this section's broad mandate that the departments "shall establish" an IDR process is not specific enough to support plaintiff's claim under APA § 706(1).[3]  "[W]hen an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."  SUWA, 542 U.S. at 65.  Defendants have undisputedly established an IDR process – it's just not one that plaintiff thinks (seemingly for good reason) is effective.  But this is not enough to support a claim under § 706(1).

The various statutory provisions related to deadlines do not direct defendants to take any discrete action either.  These provisions are directed to the regulated entities – providers, health care plans, and IDR entities – not the government agencies charged with administering the act.

- "[For emergency services] t*he group health plan or health insurance issuer* . . . not later than 30 calendar days after the bill for such services is transmitted by such provider or facility, sends to the provider or facility, as applicable, an initial payment or notice of denial of payment."  42 U.S.C. § 300gg-111(a)(1)(C)(iv).

- "[For non-emergency services] *the plan or coverage* . . . not later than 30 calendar days after the bill for such services is transmitted by such provider, shall send to the provider an initial payment or notice of denial of payment."  Id. at § 300gg-111(b)(1)(C).

- "With respect to [a covered] item or service, . . . *the provider or facility . . . or plan or coverage may*, during the 30-day period beginning on the day the

---

[3] Plaintiff also alleges that defendants have violated other provisions of the APA by acting arbitrarily, capriciously, in abuse of discretion, or otherwise not in accordance with law (§ 706(2)(A)); acting contrary to constitutional right, power, privilege, or immunity (§ 706(2)(B)); acting contrary to constitutional right, power, privilege, or immunity (§ 706(2)(B)); acting in excess of statutory jurisdiction, or limitations (§ 706(2)(C)); and acting without observance of procedure required by law (§ 706(2)(D)).  These boilerplate assertions appear to be nothing more than an exercise in unnecessary exhaustion.  Plaintiff's claims focus on agency action unlawfully withheld or unreasonably delayed under § 706(1), and plaintiff does not explain how defendants have violated any of these other provisions.  To the extent plaintiff challenges defendants' conduct as unconstitutional under § 706(2)(B), its constitutional claims are assessed – and rejected – below.

provider or facility receives an initial payment or a notice of denial of payment from the plan or coverage regarding a claim for payment for such item or service, initiate open negotiations under this paragraph between such provider or facility and plan or coverage for purposes of determining . . . an amount agreed on by such provider or facility, respectively, and such plan or coverage for payment (including any cost-sharing) for such item or service. . . . [T]he open negotiation period, with respect to an item or service, is the 30-day period beginning on the date of initiation of the negotiations with respect to such item or service." Id. at §300gg-111(c)(1)(A).

- "In the case of open negotiations . . . that do not result in a determination of an amount of payment for such item or service by the last day of the open negotiation period . . ., *the provider or facility . . . or group health plan* . . . that was party to such negotiations may, during the 4-day period beginning on the day after such open negotiation period, initiate the independent dispute resolution process." Id. at §§ 300gg-111(c)(1)(B).

- "Not later than 30 days after the date of selection of the certified IDR entity with respect to a determination for a qualified IDR item or service, *the certified IDR entity shall* . . . select one of the offers." Id. at § 300gg-111(c)(5)(A).

- "The total plan or coverage payment required . . . with respect to a qualified IDR item or service for which a determination is made . . . or with respect to an item or service for which a payment amount is determined under open negotiations . . ., *shall be made directly to the nonparticipating provider or facility* not later than 30 days after the date on which such determination is made." Id. at § 300gg-111(c)(6).

(Emphasis added).

Plaintiff's allegation that defendants have devoted insufficient monetary resources to the IDR system is also not sufficient to state a claim under the APA. See Lincoln v. Vigil, 508 U.S. 182, 192 (1993) (an agency's allocation of appropriated funds is typically committed to agency discretion by law because "the very point . . . is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way"). And while the act requires defendants to issue an "interim report" on the status of the IDR scheme by January 1, 2024, and a "final report" two years later,

defendants have not violated that statutory obligation, which has not even come due.  See 42 U.S.C. § 300gg-111(C)(5)(E)(iv).

Plaintiff also argues that defendants should be required to direct health plans to send EOB forms to providers, not just plan beneficiaries.  It claims that defendants have failed to require health plans to clearly state their understanding of whether a case is IDR eligible and an exact value of their Qualified Payment Amount ("QPA")[4] in the EOB.  Plaintiff says that allowing health care plans to omit this information has caused delays in adjudication and, in plaintiff's view, created a system in which IDR entities do not have a clear understanding of what health care plans consider to be arbitrable claims.

But again, plaintiff fails to point to any statutory provision that requires defendants to take these steps.  The act directs health care plans to send an "advanced" EOB form to plan beneficiaries, not IDR entities.  See 42 U.S.C. § 300gg-111(f)(1).  Although the act lists several requirements for information that health plans must include on the EOB form, it does not require a party to state an exact QPA or whether the claim is eligible for IDR.  See id. at § 300gg-111(f)(1)(A)-(H).

Plaintiff next argues that defendants should be ordered to "[e]stablish a streamlined process for determining threshold eligibility issues" and provide an "explanation for why a dispute is eligible or ineligible for IDR."  It also argues that defendants have failed to certify enough IDR entities to handle the volume of disputes.  Plaintiff points to language in the NSA that requires defendants to "ensure" that a certified IDR entity "has (directly or through contracts or other arrangements) sufficient medical, legal, and other expertise and sufficient staffing,"

_____

[4] The QPA is essentially the median rate that the health plan would have paid for in-coverage services in that geographic area.

"carries out the responsibilities of such an entity," and "does not under the IDR process carry out any determination [with respect to a dispute not] eligible for selection."  Id. at § 300gg-111(c)(4).

Once again, plaintiff fails to identify an unambiguous statutory requirement that the defendants have skirted.  The statute does not mandate any discrete actions to "ensure" compliance with these requirements, and plaintiff does not point to any provision requiring defendants to certify a certain number of IDR entities.

Plaintiff also alleges that defendants have demonstrated an "unwillingness to allow reasonable batching of similar claims" in a single IDR proceeding.  Although the statute sets minimum requirements for batching and authorizes the HHS Secretary to "specify criteria" on top of those minimum requirements, id. at § 300gg-111(c)(3)(A); see also 45 C.F.R. § 149.510(c)(3)(i)(C), plaintiff does not allege that defendants have prevented batching in circumstances where batching is unambiguously required under the act.

Certain states have their own IDR processes for "surprise" billing.  The NSA includes an exception that makes claims ineligible for federal IDR when a state has a specified state law that meets certain criteria regarding the provision of an alternative IDR process.  42 U.S.C. §§ 300gg-111(a)(3)(H)(i), 300gg-111(a)(3)(I).  As relevant here, New York law provides that a claim is ineligible for New York IDR if it concerns an elective procedure performed in a hospital by an out-of-network provider on a New York-regulated health plan beneficiary who was aware before arriving in the hospital that the provider was out-of-network but chose to proceed anyway.  See N.Y. Fin. Serv. L. §§ 601-08.

Plaintiff argues that defendants have unlawfully allowed federal IDR entities to reject these claims as ineligible for federal IDR based on an erroneous conclusion that the New York law serves as a "specified state law" that precludes federal IDR review – leaving plaintiff

without a forum to arbitrate these claims. This claim fails because plaintiff has not pointed to any provision of the act that requires defendants to compel arbitration of these claims. In any event, it is the IDR entities, not defendants, who are charged with making eligibility determinations under the act. See 45 C.F.R. § 149.510(c) ("[T]he certified IDR entity selected must review the information submitted in the notice of IDR initiation to determine whether the Federal IDR process applies.").

### III.   Plaintiff Fails to State a Constitutional Claim

"To plead a violation of procedural due process, a plaintiff must plausibly allege that he was deprived of property without constitutionally adequate pre- or post-deprivation process. . . . In order to do this, a plaintiff must [] identify a property right, [] show that the [government] has deprived him of that right, and [] show that the deprivation was effected without due process." J.S. v. T'Kach, 714 F.3d 99, 105 (2d Cir. 2013) (internal quotation marks omitted).

Plaintiff claims that defendants' untimely, ineffective, and inefficient administration of the federal IDR process has deprived them of the "right to be compensated for the medically necessary services that [it] provide patients" "at least at the level of the cost for providing those services."

Plaintiff's due process claim fails because it has failed to identify a federally protected property right. See Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2d Cir. 1994) ("The deprivation of a procedural right . . . is not actionable when there is no protected right at stake."). Plaintiff cites a handful of New York state cases in support of its position that it has a right to be compensated at cost by private entities (i.e., health care plans) for services it provides to private persons (i.e., patients). But none of these cases establish such a right under state law – let alone a constitutionally protected right. See Huntington Hosp. v Abrandt, 4 Misc.3d 1, 779 N.Y.S.2d

14

891 (App. Term 2004) (defendant failed to raise a triable issue of fact as to how much she owed plaintiff-hospital by pointing to the hospital's agreements with third-party insurers); Nassau Anesthesia Assocs. P.C. v Chin, 32 Misc. 3d 282, 924 N.Y.S.2d 252 (Nassau Cnty. Ct. 2011) (when a contract fails to state a specific price for medical services, the "reasonable value" of the services should reflect what the physician would actually receive from third-party payors, not just the published rate); Goldman v Ambro, 134 Misc.2d 655, 512 N.Y.S.2d 636 (Nassau Cnty. Ct. 1987) (plaintiff may not renege on an implied agreement to pay fair and reasonable value for medical services by applying for Medicaid after seeking treatment).

Even assuming that plaintiff had some right to be compensated at cost, plaintiff has not shown any deprivation of that right at the hands of the government. To the extent that health care plans have lowballed medical providers with below-cost offers or failed to pay providers on time, those are decisions made by the plans – not the government. The same is true for plaintiff's complaint that IDR entities have ruled in favor of health plans more than medical practices. Health plans and IDR entities have independent decision-making authority under the act, and "[n]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."[5] See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989). Plaintiff remains free to bring suit against these third parties to vindicate whatever property rights it may have in receiving payment for its services – and indeed has filed such suits against health plans. See e.g.,

---

[5] The "fairly traceable" standard for standing is a much lower bar than the requirement to plausibly plead government deprivation of a federally protected right for purposes of stating a due process or takings claim. See generally Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013) ("[T]he 'fairly traceable' standard is lower than that of proximate cause.").

Neurological Surgery Practice of Long Island, PLLC v. Empire Blue Cross Blue Shield, No. 23-cv-3050 (E.D.N.Y.).

Plaintiff's Takings Clause claim fails for similar reasons.  See Concrete Pipe & Prods. of Calif. Inc. v. Constr. Laborers Pension Tr. for S. Calif., 508 U.S. 602, 641 (1993) ("Given that [plaintiff's] due process arguments are unavailing, it would be surprising indeed to discover [that] the challenged statute nonetheless violated the Takings Clause.").  "[A] party challenging governmental action as an unconstitutional taking bears a substantial burden."  E. Enters. v. Apfel, 524 U.S. 498, 523 (1998) (plurality opinion).  "[T]o succeed in establishing a [Takings Clause] violation claimants must demonstrate: (1) that they have a property interest protected by the Fifth Amendment, (2) that they were deprived of that interest by the government for public use, and (3) that they were not afforded just compensation."  Ganci v. New York City Transit Auth., 420 F. Supp. 2d 190, 195 (S.D.N.Y. 2003).

Plaintiff argues that the "non-existent, delayed, or abysmally low reimbursement for medically necessary health care services that the Practice and other similarly situated out-of-network providers are experiencing [through federal IDR] constitute[s] a taking of their property."  But, again, plaintiff has failed to show that they have a federally protected property interest to be compensated at cost for services provided to a private entity and paid for by a private entity.  Plaintiff's argument isn't that defendants have deprived them of any entitlement to compensation embodied in a specific contract or reduced to judgment.  Instead, it argues that inefficiencies in the IDR system constitute a general taking of their desired compensation.  This is not enough to state a takings claim.  See Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York, No. 19-cv-11285, 2021 WL 4198332, at *13 (S.D.N.Y. Sept. 14, 2021) ("A plaintiff's property interest must stem from some 'legitimate claim of entitlement' and not just an

16

'abstract need or desire' or 'unilateral expectation.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).

Even assuming that plaintiff has some enforceable property interest – for example, when an IDR entity has rendered a decision requiring a health care plan to provide additional reimbursement to a provider – it has failed to plausibly allege any taking of that right by the government. My colleague Judge Donnelly addressed a substantially similar challenge to the NSA in Haller v. U.S. Dep't of Health & Hum. Servs., 621 F. Supp. 3d 343 (E.D.N.Y. 2022). I agree with her conclusion that "the [NSA] does not constitute a taking under the Fifth Amendment" because plaintiff still has an "avenue to obtain payment for their services." Id. at 359. As Judge Donnelly observed, "the [No Surprises] Act entails no physical invasion of property, nor any permanent confiscation of [the plaintiff's] assets for governmental use. On the contrary, the [ ] Act squarely falls within the category of legislation that serves to adjust the benefits and burdens of economic life on behalf of the common good." Id. And "[w]hile the Act prohibits out-of-network providers from balance billing patients covered by the Act, it also gives providers a right to recover the value of the services provided directly from insurers and creates a process to adjudicate that right." Id. To the extent that health care plans have delayed or refused payment despite an obligation to do so, that is not a taking *by the government*.

## CONCLUSION

For the reasons above, defendants' motion to dismiss is GRANTED and plaintiff's motion for a preliminary injunction is DENIED as moot.

Plaintiff has requested, in the event defendants' motion is granted, leave to file an amended complaint to address both lack of standing and its failure to state a claim. The Court is skeptical that either can be cured by amendment. It does not help that plaintiff's request for

17

SPA-18

leave to amend gives no indication of what the amendment might be.  It has identified no facts

that might further support its standing argument or would enable it say anything about the

workings of the statute that it has not already said in order to state a claim.  In other words, this is

not a case where the allegations are too few or insufficiently detailed.  See Ashcroft v. Iqbal, 556

U.S. 662 (2009).  Rather, all the relevant facts have been placed before the Court and the failure

is in plaintiff's legal theories.

      Nevertheless, if plaintiff believes it can cure the problems identified in this decision, it

may file an amended complaint within 14 days of entry of this decision on the docket.

**SO ORDERED.**

*Brian M. Cogan*

—————————————————————
               U.S.D.J.

Dated: Brooklyn, New York
       July 16, 2023

18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

NEUROLOGICAL SURGERY PRACTICE            :
  OF LONG ISLAND, PLLC,                   :       **MEMORANDUM DECISION AND**
                                          :       **ORDER**
                              Plaintiff,  :
                                          :       23-cv-02977 (BMC)
            - against -                   :
                                          :
                                          :
UNITED STATES DEPARTMENT OF               :
  HEALTH AND HUMAN SERVICES, *et al.*,    :
                                          :
                              Defendants. :
                                          :

-------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff Neurological Surgery Practice of Long Island, PLLC brought this action against

the United States Department of Health and Human Services, Department of the Treasury,

Department of Labor, and high-level officials of those agencies (collectively, "HHS"). It alleged

that defendants have failed to lawfully implement the No Surprises Act, Public Law No. 116-260

("NSA"), in violation of the Administrative Procedure Act, 5 U.S.C. § 706, *et seq.*, and the Fifth

Amendment's Due Process and Takings Clauses. The failure, plaintiff alleges, is that HHS had

suspended the Federal Independent Dispute Resolution portal, an arbitration process that HHS

had created pursuant to the requirements of the No Surprises Act. The portal is an arbitration

mechanism for resolving disputes between health care providers and insurers that included

extensive rules and procedures.

      In prior motion practice in the case, the Court granted defendants' motion to dismiss and

denied plaintiff's motion for a preliminary injunction. See Neurological Surgery Practice of

Long Island, PLLC v. U.S. Dep't of Health and Human Svcs., No. 23-cv-2977, 2023 WL

4552860 (E.D.N.Y. July 17, 2023).  Familiarity with that decision is presumed, and the Court

will therefore not restate the background of the case in detail.  But to summarize, plaintiff

claimed that although HHS had implemented the No Surprises Act through creating the IDR

portal and rules as required, it had unlawfully suspended or "paused" the portal, leaving plaintiff

without a mechanism to obtain payment on disputed out-of-network insurance claims.  HHS

responded that the "pause" was necessitated because it had originally estimated that the portal

and the arbitration process would handle about 22,000 claims but in fact 334,828 claims were

filed.  In addition, some of the rules were vacated by the district court in Texas Medical Ass'n v.

U.S. Dep't of Health and Human Svcs., 654 F. Supp. 3d 575 (E. D. Tex. 2023), and Texas

Medical Ass'n v. U.S. Dep't of Health and Human Svcs., 587 F. Supp. 3d 528 (E.D. Tex. 2022),

and thus had to be reimplemented. HHS claimed that it had fulfilled its statutory duty by

implementing the IDR portal and rules in the first place and the No Surprises Act did not prevent

it from pausing the procedure to refine it in response to unforeseen circumstances like judicial

decisions or gross underestimation of claims.

   This Court agreed with HHS that there was no violation of the No Surprises Act, nor

grounds for relief under the Administrative Procedures Act or the Fifth Amendment.

Nevertheless, with some skepticism, it granted plaintiff leave to file an amended complaint.

Plaintiff has done so and has renewed its motion for a preliminary injunction.  HHS seeks to

dismiss the amended complaint and opposes the injunction motion, not only on the same grounds

it previously raised, but because since the date of the original dismissal, it has ended the pause

and reinstated the rules for the processing of all claims. As a result, HHS argues, this case is

moot.  Plaintiff argues that since HHS claims to have discretionary power to pause the rules

again if it deems a pause necessary, which plaintiff claims it does not, the "likely to recur" exception to mootness applies.

I agree with HHS that this case is moot. The portal has been up and running since last October for the vast majority of claims and became operational for all claims on December 15, 2023. There is nothing in the record to suggest that the new process is inadequate to handle the previously-unanticipated number of claims; or that the concerns expressed by the court in the Eastern District of Texas have not been accommodated in the new rules; or that if some other practical infirmity arises, it cannot be dealt with without the kind of global pause that was implemented here at the inception of the portal. Although HHS has the burden of demonstrating that it is not reasonably likely that the facts giving rise to plaintiff's claims are going to recur, see Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, 954 F.3d 118, 125-27 (2d Cir. 2020), it would be too much to ask it to prove a negative. "Likely to recur" does not mean an entirely speculative possibility that complained-of conduct may occur in the future when all present circumstances point to the fact that it will not.[1]

Accordingly, plaintiff's motion for a preliminary injunction is denied and HHS's motion to dismiss is granted on the ground of mootness.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
        March 30, 2024

---

[1] Even if the Court was not dismissing the amended complaint on the ground of mootness, the Court agrees with HHS that the Court's reasoning in dismissing the original complaint is just as applicable to the amended complaint. There are no new allegations, and plaintiff is simply rearguing the substantive points under the No Surprises Act that this Court already rejected. The amended complaint would therefore be dismissed even if it wasn't moot.

SPA-22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
NEUROLOGICAL SURGERY PRACTICE
OF LONG ISLAND, PLLC,

                  Plaintiff,                            JUDGMENT
                                                23-cv-02977 (BMC)

        v.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.,

                  Defendants.
------------------------------------------------------------ X

      A Memorandum, Decision, and Order of the Honorable Brian M. Cogan, United States

District Judge, having been filed on April 1, 2024, denying plaintiff's motion for a preliminary

injunction; and granting HHS's motion to dismiss on the ground of mootness; it is

      ORDERED and ADJUDGED that plaintiff's motion for a preliminary injunction is

denied; and that HHS's motion to dismiss is granted on the ground of mootness.

Dated: Brooklyn, NY                       Brenna B. Mahoney
       April 3, 2024                      Clerk of Court

                                    By: */s/Jalitza Poveda*
                                      Deputy Clerk

SPA-23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
NEUROLOGICAL SURGERY PRACTICE        :
  OF LONG ISLAND, PLLC,              :       **ORDER**
                                 :
                Plaintiff,    :       23-cv-2977 (BMC)
                                   :
       - against -                   :
                                   :
                                   :
UNITED STATES DEPARTMENT OF          :
  HEALTH AND HUMAN SERVICES, *et al.*,   :
                                   :
            Defendants.   :
                                   :
--------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff moves for reconsideration of the Court's April 1, 2024 Order denying its motion

to file a second amended complaint and for a preliminary injunction, and granting defendants'

motion to dismiss. Plaintiff points to no new facts or law that the Court failed to consider in its

Order. Thus, for the reasons discussed in the Court's Orders dismissing plaintiff's initial and

amended complaints, the motion for reconsideration is denied.

<strong>DISCUSSION</strong>

      As an initial matter, plaintiff was not prejudiced by its lack of opportunity to reply to the

Court's March 22, 2024 Order. That Order directed defendants to advise the Court as to whether

the status of the independent dispute resolution ("IDR") process had changed since the

submission of the parties' motions. On March 28, 2024, defendants responded that there had

been no change. Plaintiff complains that the Court granted the motion to dismiss before it had

the chance to respond to this status report, but it does not dispute that, in fact, there had been no

change in the IDR process, which is all the Court wanted to know. Plaintiff is really complaining

about the fact that it would have liked to use the Court's request for a status report from defendants to create another opportunity to reassert its arguments, but that was not what the Court was looking for, as both parties had thoroughly briefed all of the outstanding issues. The Court was merely checking to see if anything had changed. Nothing had.

Nevertheless, plaintiff has used this motion for reconsideration to make the same arguments it made before. Specifically, plaintiff states that its response to the status report Order would have raised three issues: defendants' "long history" of portal suspensions and closures, which plaintiff claims is sufficient to save this case from mootness; defendants' allegedly erroneous determination that the New York Surprise Bill Law is a No Surprises Act ("NSA") state law; and continuing delays in certifying IDR entities. None of these issues merits reconsideration.

## I.    <u>Mootness</u>

The parties agree that the dispute resolution portal has been resumed as to all disputes, and plaintiff points to no concrete reason to expect that it will be paused again. Accordingly, the remedy plaintiff originally sought (<u>i.e.</u>, resumption of the IDR process) is already in place. <u>See</u> <u>Winzler v. Toyota Motor Sales U.S.A., Inc.</u>, 681 F.3d 1208, 1210 (10th Cir. 2012) ("[I]f events so overtake a lawsuit that the anticipated benefits of a remedial decree no longer justify the trouble of deciding the case on the merits, equity may demand not decision but dismissal."). This makes the action prudentially moot. Even if "a flicker of life may be left in it," the claim "no longer has sufficient utility to justify decision on the merits," since the IDR process has been fully resumed during the pendency of this action and there is no reason to believe that is going to change. <u>Id.</u> (cleaned up).

2

Plaintiff does not disagree with defendants that the dispute resolution process has been fully reopened for all claims since December 2023.  Instead, plaintiff claims that the action is not moot because defendants could re-pause or otherwise modify the IDR process in a manner that would violate the NSA.  In support of this argument, plaintiff asserts that the Court's Order dismissing the case ignored the "long history" of defendants' inaction regarding the IDR process, and that if the Court had considered that history, it would have held that this case falls into a mootness exception (presumably voluntary cessation or "capable of repetition, yet evading review").

But this argument ignores the context of the events giving rise to this suit.  Defendants paused the IDR process in response to a federal judicial decision that partially vacated the NSA and certain guidance documents.  See Texas Med. Ass'n v. United States Dep't of Health and Human Servs., No. 22-cv-372, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023).  Nothing in the record suggests that there will be another decision requiring an additional pause of the IDR process, and plaintiff cites no other reasons why the alleged misconduct is likely to recur.  The mere fact that defendants previously paused the IDR process does not make it any more likely that defendants will do so again in the future.  Absent any non-speculative reason to believe the defendants will re-pause the IDR process, this action does not fall under either the voluntary cessation or the "capable of repetition, yet evading review" mootness exceptions.  See, e.g., Pierre-Paul v. Sessions, 293 F. Supp. 3d 489, 492-93 (S.D.N.Y. 2018).

Therefore, plaintiff's claims were properly dismissed as moot.

## II.    APA

As stated in my Order dismissing the case, this action should be dismissed on the merits even if it is not moot.  According to plaintiff, the NSA requires defendants to ensure that a

substantial number of IDR entities are certified to ensure the timely and efficient provision of IDR determinations, which is a discrete agency action that defendants are required to take.

To be clear, this is not a case where an agency failed to act. There is no dispute that the agency "established a process," as required by its statutory framework. Rather, plaintiff alleges that defendants have violated the NSA because the process they established was statutorily insufficient.

The deferential standard for reviewing agency actions, which is found in Section 706(1) of the Administrative Procedure Act, "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act." As I previously held, the NSA does not prohibit the process that the agency established here. Nor does the statute preclude defendants from temporarily pausing the portal.

Perhaps if defendants paused the portal for an unreasonably long period of time, or without sufficient reason, they would run afoul of their statutory direction. But that is not what is happening here. Temporarily pausing the portal in response to a federal judicial decision that suggested such a pause was not unreasonable. In fact, this flexibility is helpful, if not necessary, to establishing and maintaining a dispute resolution system in a dynamic environment. Congress surely was aware of that when it passed the NSA, and I decline to question its judgment by holding defendants to rigid standards that Congress did not set.

The same reasons foreclose plaintiff's argument that defendants violated the APA by not certifying enough IDR entities. The NSA tasks defendants with ensuring "that a sufficient number of [IDR] entities are certified . . . to ensure the timely and efficient provision of [IDR] determinations." As I noted when rejecting this argument in connection with defendants' first motion to dismiss, "the statute does not mandate any discrete actions to 'ensure' compliance with

4

these requirements, and plaintiff does not point to any provision requiring defendants to certify a certain number of IDR entities." The NSA does require a discrete action from defendants: they must "establish a process to certify" IDR entities, which they have indisputably done. Plaintiff now asks this Court to go one step further by dictating *how* defendants shall establish that process – that is, "directing how [they] shall act" – which is precisely what the APA forbids. <u>See</u> <u>Norton v. S. Utah Wilderness All.</u>, 542 U.S. 55, 64 (2004).

Because I reject plaintiff's core theories that the NSA prohibits defendants from temporarily pausing the portal and requires them to certify a certain (greater) number of IDR entities, it would be futile to permit plaintiff to amend its claims. This decision is bolstered by the fact that I previously allowed plaintiff to amend its initial complaint, and its amended complaint fails on essentially the same grounds as the first one. Even assuming that plaintiff is right that compelling defendants to certify additional IDR entities and preventing them from pausing the portal would create a more efficient process, the APA does not permit plaintiff to "seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made," as it attempts to do here. <u>See</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 891 (1990).

### III.    <u>State Law Designation</u>

Finally, plaintiff argues that defendants violated the All Writs Act and APA when they "wrongfully determined that the New York Surprise Bill Law is a specified state law under the NSA." According to plaintiff, the erroneous decision has injured it by causing confusion and delays in the IDR process. Plaintiff further claims that defendants have failed to provide clarifying guidance on this issue, and that the Court should Order defendants to "take all steps necessary to correct its erroneous determination and provide clarified guidance."

5

SPA-28

Defendants do not appear to dispute that their initial determination regarding the New York Surprise Bill Law was incorrect.  Indeed, the fact that defendants modified the guidance in question indicates they agree that their initial determinations and guidance were lacking. Instead, defendants assert that the NSA does not require them to issue any particular guidance.

It is reasonable to assume that improper guidance from defendants would confuse IDR entities, causing further delays.  It is also plausible that defendants could improve the efficiency of the IDR system by, *inter alia*, issuing clear and legally accurate guidance to the IDR entities. This, in turn, could aid IDR entities in making well-informed eligibility determinations.  But I cannot compel defendants to take actions simply because of a subjective belief – even my own belief – that the IDR process would run more efficiently if defendants operated differently.  As with the rest of plaintiff's arguments, this claim fails because the NSA does not include any "discrete requirement" for defendants to operate the IDR process in plaintiff's desired fashion.[1]

## CONCLUSION

For the foregoing reasons, plaintiff's [46] motion for reconsideration is denied.


**SO ORDERED.**

_Brian M. Cogan_
_____
U.S.D.J.


Dated: Brooklyn, New York
       June 10, 2024

---

[1] In any event, as stated in the Court's Order dismissing the initial complaint, "it is the IDR entities, not defendants, who are charged with making eligibility determinations under the act."

6